United States District Court

For the Northern District of California

1
2
3
4
5               UNITED STATES DISTRICT COURT
6               NORTHERN DISTRICT OF CALIFORNIA
7
8
9
10   ELBERT HARRIS,
11         Plaintiff,                      No. C 08-2353 PJH
12      v.                                 **ORDER GRANTING DEFENDANTS'
                                            MOTION FOR SUMMARY JUDGMENT
13   CITY AND COUNTY OF SAN                 IN PART AND DENYING IT IN PART**
     FRANCISCO, et al.,
14
           Defendants.
15   _____/
16         Defendants' motion for summary judgment came on for hearing before this court on

17   July 29, 2009.   Plaintiff appeared by his counsel Curtis G. Oler, and defendants appeared

18   by their counsel Deputy City Attorney Adelmise R. Warner.  Having read the parties' papers

19   and carefully considered their arguments and the relevant legal authority, and good cause

20   appearing, the court hereby GRANTS the motion in part and DENIES it in part, as follows.

21                              **INTRODUCTION**

22         This is an employment case alleging wrongful termination, retaliation, and

23   harassment on the basis of race.  Plaintiff Elbert Harris III ("Harris") is a 48-year-old

24   African-American man.  From 1984 until 2008, he was employed as a Civil Service Class

25   2302 Certified Nursing Assistant ("CNA") at Laguna Honda Hospital and Rehabilitation

26   Center ("Laguna Honda"), operated by the Department of Public Health of defendant City

27   and County of San Francisco ("the City").  From the time he was hired until 2007, he had

28   no disciplinary action taken against him.

**United States District Court**
For the Northern District of California

1    Following an altercation on March 19, 2008 between Harris and defendant Larry

2    Bevan ("Bevan"), employed as a Psychiatric Technician at Laguna Honda, Harris was

3    suspended without pay pending an investigation into whether the had violated the City's

4    policy against workplace violence.

5    Harris filed administrative charges of discrimination with the California Department of

6    Fair Employment and Housing ("DFEH") and the Equal Employment Opportunity

7    Commission ("EEOC") on May 6, 2008.  He filed the present action on May 7, 2008,

8    asserting claims of racial discrimination and retaliation under Title VII of the 1964 Civil

9    Rights Act ("Title VII"), 42 U.S.C. § 2000e, et seq.; the Fair Employment and Housing Act

10   ("FEHA"), California Government Code § 12900, et seq.; and 42 U.S.C. § 1981.

11   Defendants are the City, Bevan, and Robert Thomas ("Thomas"), the Director of Human

12   Resources at Laguna Honda.  Harris received right-to-sue notices from DFEH on May 19,

13   2008, and from the EEOC on June 6, 2008.

14   Harris was terminated on May 16, 2008 after he refused to comply with certain non-

15   disciplinary actions set by the City as a condition of his continued employment, following

16   the investigator's recommendations.  On July 25, 2008, he filed another charge

17   concurrently with DFEH and the EEOC, and received right-to-sue letters on July 25 and

18   August 8, 2008.  He amended the complaint on September 21, 2008.

19   Harris alleges six causes of action:  (1) discrimination in violation of § 1981, against

20   all defendants; (2) discrimination in violation of Title VII, against the City; (3) retaliation in

21   violation of Title VII, against all defendants; (4) discrimination in violation of FEHA, against

22   the City; (5) retaliation in violation of FEHA, against the City; (6) harassment in violation of

23   FEHA, against all defendants.  Defendants now seek summary judgment on all six causes

24   of action.

25                                    **BACKGROUND**

26   Laguna Honda is the largest single-site municipally-owned and -operated skilled

27   nursing facility in the United States.  It provides a full range of skilled nursing services to

28   disabled or chronically ill adult residents of San Francisco, including specialized care for

United States District Court

For the Northern District of California

1   those with wounds, head trauma, stroke, spinal cord injuries, orthopedic injuries, AIDS, and

2   dementia.  The hospital also has a hospice program.

3        As a CNA, Harris assisted Laguna Hospital staff by maintaining patients' personal

4   hygiene and comfort, assisting with minor treatments, moving patients when necessary,

5   maintaining a safe and clean environment for patients, reinforcing instruction and

6   counseling to patients, and accompanying patients to recreational or diversional activities.

7        On September 7, 2007, Thomas received a verbal complaint from Bevan, who

8   claimed that Harris had threatened him and had used inappropriate language toward him

9   the previous day, while on Laguna Honda property.  Bevan memorialized his complaint in a

10  letter dated September 8, 2007, which Thomas received on September 11, 2007.

11       In his complaint, Bevan stated that he and Harris had had a disagreement on

12  September 6, 2007, while in the parking lot of Laguna Honda, regarding some discussion

13  that had taken place during a union meeting the week before.  Harris wanted Bevan to

14  apologize for using profanity at the union meeting, and Bevan refused because he could

15  not recall using any profanity.

16       Bevan claimed that Harris became very agitated and used a loud tone of voice

17  during the September 6 discussion.  According to Bevan, Harris said he could not respect

18  Bevan as a man, and warned Bevan that he (Harris) was from Bayview Hunter's Point, that

19  he wanted to get rid of Bevan as a shop steward, and that Bevan would have to deal with

20  him (Harris) if Bevan remained at Laguna Honda.

21       Bevan claimed that as the discussion proceeded, Harris became louder and more

22  agitated, and then began to move toward Bevan until he was less than six inches from

23  Bevan's face.  Bevan asserted that at least twice, Harris gestured with his hands, pointing

24  at this eyes and then directing his hands to Bevan's face, as if to say that he was watching

25  Bevan.

26       Harris tells a somewhat different story.  He claims that at some point shortly before

27  September 6, 2007, at a "town hall meeting" at Laguna Honda, Bevan was addressing a

28  group of co-workers when he began "screaming at the group, pointing his fingers at us,

United States District Court

For the Northern District of California

1  using extreme profanity, referring to females in the group as bitches, and shouting 'kiss my

2  ass' as he stormed out of the room."

3      Harris contends that on September 6, 2007, he encountered Bevan at the Nursing

4  Office, and asked him to step outside for a moment in the presence of three other

5  employees.  Harris claimed that he spoke "quietly" with Bevan, suggesting that the

6  language and profanity he had used at the town hall meeting were inappropriate, and that

7  Bevan should apologize to that group.  According to Harris, Bevan told him he would never

8  apologize.  Harris' response was that he could not respect Bevan as a man if he did not

9  offer that apology.

10     After being advised of Bevan's verbal complaint on September 7, 2007, Thomas

11 decided to recommend placing Harris on unpaid administrative leave pending an

12 investigation into the allegations.  Thomas asserts that this recommendation was made

13 pursuant to § A8.341(A) of the San Francisco City Charter, which provides that "[p]ending

14 investigation of conduct involving . . . [various improper actions, including] mistreatment of

15 persons, . . . . the appointing officer may place the accused person on unpaid

16 administrative leave for no more than 30 days unless the investigation shall be delayed

17 beyond such time by the act of the accused person."

18     The Department held a <u>Skelly</u> meeting[1] on September 10, 2007.  At the conclusion

19 of the meeting, Thomas advised Harris that he would be placed on administrative leave

20 effective as of the close of business on September 11, 2007.  Following an investigation by

21 a Senior Personal Analyst, Thomas determined that Harris had not violated the policy

22 against workplace violence.  As recommended by the investigator, Thomas met with Harris

23 to counsel him that raising one's voice and arguing in public is inappropriate in the

24 workplace, and that co-workers should be treated with courtesy and respect.  Susan Stofan

25 (the SEIU Local 1021 representative) met several times with both Harris and Bevan in an

26 effort to mediate the matter.  The City returned Harris to full duty effective October 7, 2007,

27  _____

28      [1]  <u>Skelly v. State Personnel Bd.</u>, 15 Cal. 3d 194, 215 (1975), grants notice and a right
to be heard to all California public employees before discipline is imposed.

with payment of all back wages missed during his administrative leave.

Harris asserts that although he complained to Thomas concerning what he describes as "Bevan's violation of violence in the workplace policy during a town hall meeting at Laguna Honda when . . . Bevan shouted at a group of persons, including me, using extreme profanity and threatening language," no disciplinary action was taken against Bevan following this incident.

Approximately six months later, on March 19, 2008, Thomas received a phone call from Nursing Director Lenora Jacobs, asking him to activate the hospital's Staff Incident Response Team ("SIRT"). Ms. Jacobs stated that Nursing Office staff were distressed following an altercation between Harris and Bevan. After speaking with Ms. Jacobs, Thomas contacted Dr. Brenda Austin, the hospital's Clinical Psychologist, to facilitate the SIRT intervention, and asked her to report back to him her findings and recommendations.

Later that day, Dr. Austin met with Thomas and Mr. Ramirez, to discuss what she had learned from staff and had observed in the SIRT meeting. According to Dr. Austin, Nursing Office staff told her that Harris came into the Nursing Office to find his wife's paycheck. (Harris' wife, Joycelyn Harris, is also a CNA at Laguna Honda.) As Harris was rummaging through the box holding the paychecks or paystubs, Grace Gancayco, the clerk on duty that morning, tried to help him. However, she could not find the paycheck. She then asked Harris to step outside of the office, and said she would try to find the paycheck. Harris allegedly began to berate Ms. Gancayco, saying things such as "You're incompetent."

Bevan states in his declaration that he was sitting in an adjacent room in the Nursing Office, and heard the commotion and loud voices coming from the area where Harris and Ms. Gancayco and Mr. Harris were. Bevan came out to assist, and asked Harris to leave the Nursing Office so he (Bevan) and Ms. Gancayco could help him. Harris refused to leave, and continued to shuffle through the box of paychecks, attempting to locate his wife's paycheck. Bevan claimed that Harris struck his arm, and continued to insult and bait him (Bevan).

**United States District Court**
For the Northern District of California

1    Ms. Saez-Fontillas and Ms. Kaminsky were in the adjacent room where Bevan had

2   been previously.  Dr. Austin states that both Ms. Saez-Fontillas and Ms. Kaminsky told her

3   that they were frightened by Harris' tone.  She states that Ms. Hunt and Ms. Griffith told her

4   they were passing by at the end of the incident and saw Harris walking from the Nursing

5   Office looking angry and agitated.  Ms. Hunt also told Dr. Austin that she was upset

6   because she had had a previous incident with Harris.  Dr. Austin reported that the Nursing

7   Office staff all indicated that they were personally afraid of what Harris might do during the

8   incident, which occurred in a small office.  Dr. Austin also stated that Ms. Kaminsky and

9   Ms. Griffith were tearful at times as they recounted the incident to her.

10   Raymond Glover, a CNA at Laguna Honda, states in his declaration that on the

11   morning of March 19, at about 8:15 a.m., he was in the Nursing Office conversing with Ms.

12   Gancayco when Harris walked in and asked Ms. Gancayco about his wife's paystub.

13   According to Mr. Glover, as Harris was leaving through the pay envelopes, Bevan walked

14   into the office and attempted to snatch the envelopes from Harris' hands.  Harris said

15   something to the effect of "Why are you grabbing the pay stubs from me?" or "Don't ever

16   attempt to grab anything from my hands again."  Glover states that he heard Bevan telling

17   Harris to step out of the office, but that he never heard Harris raise his voice.

18   Harris also describes the incident in his declaration, stating that his wife had been

19   unable to locate her pay envelope, and that he had gone into the Nursing Office to see if he

20   could locate it for her.  He admits that he walked into the office without permission, but

21   claims that it was routine for people to enter to locate pay envelopes.  He saw no staff

22   when he entered, but states that Ms. Gancayco then came in from the next room.  He

23   asked her where the pay envelopes were located, and she pointed to a box on the table.

24   Harris claims that as he was leafing through the envelopes looking for his wife's

25   envelope, "among numerous other pay envelopes," Bevan "walked in and without warning

26   or notice, abruptly attempted to physically snatch the pay envelopes from my hands at

27   which time I told him never to attempt to take anything from my hand again."  Harris insists

28   that "at no time" did he "hit, touch, or 'smack' . . . Bevan or attempt or threaten to hit, touch

United States District Court

For the Northern District of California

1   or 'smack'" him in any manner.  He also denies raising his voice during the incident.

2       Harris also provides a declaration from Sophie Mace, the night Nursing Supervisor,

3   who states that she asked Ms. Gancayco whether she was afraid, and she said, "No."  In

4   addition, Ms. Maces states that although she was the highest-ranked employee at night,

5   she was not questioned by anyone regarding the March 19, 2008 incident.

6       After his discussion with Dr. Austin, Thomas decided to recommend to John

7   Kanaley, Laguna Honda's Executive Administrator, that the Department place Harris on

8   unpaid administrative leave for 30 days pending an investigation into the allegation that, on

9   March 19, 2008, he had entered the Nursing Office without permission, and had been

10  verbally abusive and acted inappropriately toward staff.  Thomas says that Mr. Kanaley

11  (who is no longer alive) concurred with Thomas' recommendation.

12      The Department scheduled a <u>Skelly</u> meeting with Harris for the following day, March

13  20, 2008.  Following the meeting, Thomas sent Harris a letter, also signed by Mr. Kanaley,

14  notifying Harris that he was on unpaid administrative leave, effective March 20, 2008,

15  pending an investigation of mistreatment of persons and violence in the workplace, based

16  on the March 19, 2008 incident.

17      Thomas immediately assigned Rhonda Lunsford, a Senior Personnel Analyst from

18  San Francisco General Hospital, to investigate the allegations against Harris.  Ms. Lunsford

19  states in her declaration that she interviewed relevant witnesses who were identified to her

20  by Laguna Honda, and others who were disclosed to her during the investigation.

21      Ms. Lunsford states that after analyzing the information obtained from the interviews,

22  as well as the documents, she concluded that Harris and Bevan had an on-going personal

23  conflict that stemmed back to September 2007, and which had not been adequately

24  resolved.  She also concluded that the incident that occurred on March 19, 2008, would

25  likely occur again unless both Harris and Bevan addressed their personal conflicts and

26  acknowledged the Department's expectations regarding their interpersonal relationships

27  and demeanor in the workplace.  She believed that both Harris and Bevan had an equal

28  responsibility to address those issues.

1    On April 4, 2008, Dr. Austin provided Thomas with a report regarding the SIRT

2  intervention.  She recommended that the hospital install a glass partition on the Nursing

3  Office door, and that the hospital also consider establishing alternative methods of

4  distributing the paychecks, and requiring each employee to pick up his or her own

5  paycheck.

6    On April 17, 2008, Ms. Lunsford provided Thomas with a report containing a

7  summary of her investigation, her findings, and her recommendations as to the appropriate

8  course of action with respect to both Harris and Bevan.  She found that Harris had been

9  abusive (loud and demeaning) to Ms. Gancayco, and had refused to step outside the

10  Nursing Office despite multiple requests.  She also found that Bevan had initially gotten

11  involved in an attempt to defuse the situation between Harris and Ms. Gancayco.  She

12  found that even though Bevan did not reach over to take the paystubs (or paychecks) from

13  Harris' hands, he (Bevan) was calm and respectful.

14    On the other hand, Ms. Lunsford found that Harris was upset and had called Bevan

15  various names and made what appeared to Bevan to be threats of violence.  She

16  concluded that Harris had initiated the aggression, which had negatively affected the entire

17  Nursing Staff; that he was unable to de-escalate himself during the exchange with Bevan;

18  and that he had refused to take any responsibility for the incident.

19    Nevertheless, Ms. Lunsford concluded that both Harris and Bevan had responsibility

20  for addressing their ongoing interpersonal conflicts, and suggested that if they did not

21  resolve their issues, it was likely that they would have additional conflicts in the future.  She

22  recommended that both Harris and Bevan be reassigned to other sites (outside Laguna

23  Honda) for a period of no less than three months, so that the following interventions could

24  be accomplished and provided in a neutral setting.  For each, she recommended

25    (1)    16 hours of anger management training;

26    (2)    8 hours of conflict resolution training;

27    (3)    a mediated conflict resolution and communication session between Harris

28  and Bevan by an outside, professional mediator;

8

United States District Court

For the Northern District of California

1    (4)    an agreement between Harris and Bevan that they understand the

2 parameters of their working relationship, and that they will utilize respectful communication

3 and methods to address future conflicts between them; and

4    (5)    a written acknowledgment from both Harris and Bevan that they have read

5 and understand the Department and City Violence in the Workplace Policies and the

6 Harassment Free Workplace Policies.

7    Thomas reviewed Ms. Lunsford's report with the Chief Nursing Officer.  They both

8 concurred with Ms. Lunsford's recommendations, finding them reasonable, and equally

9 applicable to both Harris and Bevan.  Thomas also believed the recommended procedures

10 would give Harris and Bevan time to cool off and to learn techniques for managing their

11 personal conflicts.

12    Harris and Bevan were advised that the Department had adopted the

13 recommendations, and would require each to participate in the recommended measures.

14 Thomas states that Bevan participated in all the measures that did not require Harris' co-

15 participation, including being reassigned to San Francisco General Hospital for three

16 months.  However, Harris refused to participate in any of the interventions that involved

17 Bevan, or that involved admitting any responsibility for the March 19, 2008 incident.

18    The Department offered to make Harris whole by paying him his wages lost during

19 the investigation, and also enlisted the help of SEIU Local 1021 representatives in an

20 attempt to convince Harris to participate in the recommended measures.  As of May 6,

21 2008, however, Harris continued to refuse to accept the directive to participate in the

22 recommended programs.  Thus, Thomas recommended that the Department terminate

23 Harris' employment.  The Department scheduled a Skelly meeting for May 16, 2008, to give

24 Harris another opportunity to respond to the proposed action.

25    The Department held the Skelly meeting as scheduled.  Following the meeting,

26 Thomas recommended to Mr. Kanaley that Harris be dismissed from employment.  On May

27 16, 2008, Mr. Kanaley sent Harris a notice of dismissal, advising him that the Department

28 had decided to terminate his employment for failure to follow the directions of management

United States District Court

For the Northern District of California

1  to take appropriate steps necessary to modify his behavior in compliance with the

2  Department's policies prohibiting workplace violence.

3          On May 22, 2008, Harris responded to the notice of termination, objecting to the

4  "false representations" by Mr. Kanaley in the notice.  He argued that he had not violated the

5  policy against workplace violence.  In the declaration he submitted in opposition to

6  defendants' motion, he asserts that he is "a soft spoken Christian Minister continuing to

7  practice his faith in the City and County of San Francisco."

8          He states that he "enjoy[s] a reputation" for never using profanity or raising his voice

9  among his fellow employees, friends, associates, and family members, and denies that he

10  raised his voice or put his hands on Bevan.  He provides declarations from various people

11  (including his wife) who testify to the fact that he is "soft-spoken," "even-tempered," "well-

12  mannered," and "easy-going," and that he "never raises his voice."  He also provides a

13  declaration from a psychologist (Dr. Zacher) who has been treating him for depression, who

14  states that in her opinion, Harris does not need anger management or conflict resolution

15  training to avoid violence in the workplace.

16          In sum, Harris' main complaint, and the underlying basis for his lawsuit, is his belief

17  that he was treated unfairly because he was placed on unpaid administrative leave during

18  the investigation of the March 19, 2008 incident, while Bevan, who is white, was not.  He

19  believes that the motive for disciplining him by placing him on unpaid administrative leave

20  was discriminatory, based on his race.  He also claims that he made complaints about

21  Bevan's behavior, but nothing was ever done in response – in contrast to the response

22  when Bevan complained in September 2007 about Harris' behavior.

23          The City asserts that Harris was terminated because he refused to perform the

24  required actions following the investigation of the March 19, 2008 incident (take 16 hours of

25  anger management training and 8 hours of conflict resolution; engage in a mediated

26  communication session with Bevan; sign an agreement with Bevan that both understand

27  the parameters of their working relationship, and that they have read and understood the

28  Department's and the City's policies re workplace violence).

United States District Court

For the Northern District of California

**DISCUSSION**

A.    Legal Standard

Summary judgment is appropriate when there is no genuine issue as to material facts and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56. Material facts are those that might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Id.

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  Southern Calif. Gas. Co. v. City of Santa Ana, 336 F.3d 885, 888 (9th Cir. 2003).

On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case.  Celotex, 477 U.S. at 324-25.  If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion.  See Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 250.

B.    Defendants' Motion

1.    Discrimination claims

Harris alleges claims of racial discrimination under Title VII and FEHA.  "A person suffers disparate treatment in [his or her] employment when he or she is singled out and treated less favorably than others similarly situated on account of race."  Cornwell v. Electra Central Credit Union, 439 F.3d 1018, 1028 (9th Cir. 2006).

Evidence of discrimination may be direct or indirect.  To prevail on a claim of discrimination based on disparate treatment using indirect evidence, a plaintiff must first

United States District Court

For the Northern District of California

1    establish a prima facie case that gives rise to an inference of unlawful discrimination.  If the

2    plaintiff succeeds in establishing a prima facie case, the burden then shifts to the defendant

3    to articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory conduct.

4    If the defendant provides such a reason, then the burden shifts back to the plaintiff to show

5    that the employer's reason is a pretext for discrimination.  McDonnell Douglas Corp. v.

6    Green, 411 U.S. 792, 802-05 (1973); Vasquez v. County of Los Angeles, 349 F.3d 634,

7    640 (9th Cir. 2003).  The McDonnell Douglas burden-shifting framework is also applicable

8    to claims of discrimination pursuant to California law under FEHA.  See Guz v. Bechtel Nat.

9    Inc., 24 Cal.4th 317, 354 (2000).

10         Defendants argue that summary judgment should be granted as to Harris' claims for

11   discrimination because he cannot establish a prima facie case.  A plaintiff may establish a

12   prima facie case of disparate treatment by showing that he belongs to a protected class;

13   that he was performing his job satisfactorily; that he suffered an adverse employment

14   action; and his employer treated him differently than a similarly situated employee who

15   does not belong to the same protected class.  Cornwell, 439 F.3d at 1028 (citing McDonnell

16   Douglas, 411 U.S. at 802).  The standard adopted by the California Supreme Court in the

17   FEHA analysis differs slightly in that, to establish a prima facie case, a plaintiff must also

18   demonstrate "some other circumstance" that suggests discriminatory motive.  See Guz, 24

19   Cal.4th at 355.

20         Here, Harris challenges two discrete acts – the decision to place him on unpaid

21   administrative leave on March 19, 2008, and the decision to terminate him on May 16,

22   2008.  Defendants argue that there is no evidence of "some other circumstance"

23   suggesting discriminatory motive as to those two discrete acts.

24         Defendants also contend that the City had legitimate reasons for taking those

25   actions, asserting that the evidence shows that the decision to place Harris on unpaid

26   administrative leave was taken in response to a report from the Nursing Director that he

27   had violated the City's workplace violence policy; and that the evidence shows that the

28   decision to terminate him was taken because he refused to comply with the

United States District Court

For the Northern District of California

1  recommendations made by the independent investigator, despite being advised that failure

2  to do so would result in dismissal, and also refused to provide assurance that he would

3  abide by the workplace violence policy in the future.

4       At the hearing on the present motion, counsel for the City also asserted that Thomas

5  was required, under the provisions of the City Charter, to place Harris on unpaid

6  administrative leave pending the investigation, and that because the complaint by the

7  Nursing Staff had been made against Harris, but not against Bevan, it would have violated

8  the City Charter to have placed Bevan on unpaid leave at the same time.

9       Finally, defendants contend that Harris has failed to show that the City's articulated

10  reasons for its actions were a pretext for discrimination, as he has provided no evidence

11  either showing that the explanations were false, or showing that racial discrimination more

12  likely than not was the motivating factor for the City's actions.

13       The court finds that the motion must be DENIED.  As an initial matter, the court finds

14  that Harris has provided evidence sufficient to establish a prima facie case with regard to

15  the suspension.  "The requisite degree of proof necessary to establish a prima facie case . .

16  . on summary judgment is minimal and does not even need to rise to the level of a

17  preponderance of the evidence."  Cordova v. State Farm Ins. Cos., 124 F.3d 1145, 1148

18  (9th Cir.1997).

19       Harris is a member of a protected class, he was performing his job satisfactorily, he

20  suffered an adverse action (suspension without pay pending investigation), and he was

21  treated differently than a similarly situated employee who is not a member of the protected

22  class.  By contrast, Bevan, who is white, was not placed on unpaid administrative leave,

23  despite having been involved in the altercation with Harris.  This is sufficient to establish the

24  fourth element of the prima facie case, whether it is characterized as "treated differently

25  than others not in the protected class" or as "some other circumstance suggesting

26  discriminatory motive."

27       The burden thus shifts to defendants to provide evidence establishing the existence

28  of a legitimate nondiscriminatory reason for the City's actions.  While it is true that the City

United States District Court

For the Northern District of California

1   has articulated a reason for suspending Harris without pay, plaintiff has raised a triable

2   issue with regard to whether the articulated reason was legitimate.  Defendants rely on the

3   statements of Thomas, Bevan, and other witnesses, in an attempt to show that Harris

4   engaged in workplace violence.  In particular, defendants rely on Thomas' statement in his

5   declaration that he acted based on the report from the Nursing Staff, and that he placed

6   Harris on unpaid leave pending investigation pursuant to the provision in the City Charter.

7          However, Harris flatly denies having engaged in violence, and disputes the accounts

8   of defendants' witnesses with his own statements and statements of other witnesses.

9   Although some of the evidence provided by both sides consists of inadmissible hearsay,

10  the court finds that Harris has provided evidence sufficient to create a triable issue with

11  regard to the City's proffered explanation for its actions.

12         Because defendants have not met their burden under the second step of the

13  McDonnell-Douglas analysis, the court finds it unnecessary to address the arguments

14  regarding whether the City's articulated reasons were a pretext for discrimination.

15         Finally, given the existence of a triable issue of fact regarding whether the City's

16  articulated reasons for the suspension were legitimate, and the interrelatedness of the

17  suspension and subsequent termination, the court finds that a triable issue remains as to

18  the termination as well.  If Harris establishes that there was discrimination in the

19  suspension, he may be able to show that the City had no basis upon which to terminate

20  him for resisting the proposed corrective action.

21         2.      Retaliation claims

22         Plaintiff alleges retaliation in violation of Title VII and FEHA based on the same two

23  discrete acts as in the claims for discrimination.  When there is no direct evidence, courts

24  use the "shifting burdens" framework discussed above to address claims of retaliation.

25  Bergene v. Salt River Project Agr. Imp. and Power Dist., 272 F.3d 1136, 1140 (9th Cir.

26  2001); Flait v. North American Watch Corp., 3 Cal. App. 4th 467, 476 (1992).  To make out

27  a prima facie case of retaliation, a plaintiff must demonstrate that he engaged in a

28  protected activity, that he suffered an adverse employment action, and that there was a

United States District Court

For the Northern District of California

1   causal link between his activity and the employment decision.  Stegall v. Citadel Broad.

2   Co., 350 F.3d 1061, 1065-66 (9th Cir. 2003); Iwekaogwu v. City of Los Angeles, 75 Cal.

3   App. 4th 803, 814-15 (1999).

4          If a prima facie case of retaliation is established and the employer articulates some

5   legitimate nonretaliatory reason for the challenged action, the plaintiff must demonstrate a

6   genuine issue of material fact as to whether the reason advanced by the employer was a

7   pretext.  Brooks v. City of San Mateo, 229 F.3d 917, 928 (9th Cir. 2000).

8          Defendants argue that summary judgment should be granted as to the retaliation

9   claims because Harris cannot show that the City's actions were taken because he engaged

10  in protected conduct.  They note that he testified in his deposition that he had engaged in

11  protected activity because he had complained about differential treatment throughout his

12  employment.  However, defendants assert, there is no evidence apart from these

13  unsupported statements made at deposition, and even if he did engage in protected

14  activity, he cannot show that the City retaliated against him because of those complaints.

15         The court finds that the motion must be DENIED.  Harris engaged in protected

16  activity by attempting to file a complaint of violence in the workplace against Bevan on

17  September 10, 2007 and again on March 20, 2008, and was thereafter subjected to an

18  adverse action (suspension without pay).  He also engaged in protected activity by filing the

19  administrative charges of discrimination on May 6, 2008, and was thereafter subjected to

20  an adverse action (termination).

21         Defendants argue that Harris has failed to show any causal link between any

22  protected activity and the employment actions at issue, or that the City's articulated

23  reasons for its actions are pretextual.  Defendants argue that Harris' evidence consists of

24  the mere allegation that he complained to Thomas about Bevan, that he filed administrative

25  charges, and that he filed the present action, and that he was placed on unpaid leave and

26  then terminated, and that there must be a causal link between his complaints and the City's

27  actions.  Defendants contend that Harris' argument is nothing more than pure speculation,

28  and that he has provided no evidence to rebut the City's articulated non-discriminatory

15

United States District Court

For the Northern District of California

1    reason for its actions.

2          The question of a "causal link" is always difficult to disprove when, as here, there is

3    temporal proximity between the complaint and the adverse action.  "The causal link

4    between a protected activity and the alleged retaliatory action can be inferred from the

5    timing alone where there is a close proximity between the two."  Thomas v. City of

6    Beaverton, 379 F.3d 802, 812 (9th Cir. 2004); see also Clark County Sch. Dist. v. Breeden,

7    532 U.S. 268, 273 (2001) (temporal proximity alone may establish evidence of causation,

8    but the temporal proximity must be "very close").

9          While it is causation, not temporal proximity itself, that is an element of plaintiff's

10   prima facie case – with temporal proximity merely providing an evidentiary basis from which

11   an inference can be drawn, Porter v. Calif. Dep't of Corr., 419 F.3d 885, 895 (9th Cir. 2005)

12   – the court finds that plaintiff in the present case has provided sufficient evidence to meet

13   the requirements of the prima facie case.

14         As for defendants' articulation of a non-discriminatory reason for its actions, the

15   same analysis applies as in the discrimination claims.

16         3.     Harassment claim

17         Defendants contend that summary judgment is warranted on the FEHA harassment

18   claim because plaintiff cannot show that he was subjected to conduct based on race that

19   was so severe or pervasive so as to alter the conditions of employment.

20         To prevail on a racial harassment claim under FEHA, Harris must establish that he

21   was subjected to offensive comments or other abusive conduct that was clearly based on

22   his race or color, and that the conduct was sufficiently severe or pervasive as to alter the

23   conditions of his employment.  Aguilar v. Avis Rent A Car System, Inc., 21 Cal. 4th 121,

24   130 (1999).  He must show a "concerted pattern of harassment of a repeated, routine, or

25   generalized nature."  Id. at 131.  Occasion, sporadic, or trivial acts are not sufficient to alter

26   the conditions of employment and create a hostile work environment.  Id. at 130-31.

27         Defendants argue that summary judgment should be granted because there is no

28   evidence that Thomas' recommendation that Harris be placed on unpaid administrative

United States District Court

For the Northern District of California

1   leave and that he be terminated were motivated by race, and because there is no evidence

2   that Harris' workplace environment was permeated by severe or pervasive conduct that

3   would amount to workplace harassment.

4        Defendants note that Harris conceded in his deposition that neither Thomas nor

5   Bevan ever uttered any racial slur or made any other comment about Harris' race, and also

6   note that none of Harris' witnesses were able to come up with any derogatory comments

7   that were made to Harris, and that the SEIU Local 1021 union representative confirmed

8   that Harris never told him that either Thomas or Beven ever made any comments about his

9   (Harris') race.

10       In opposition, Harris argues that the record shows that he was subjected to

11  harassment on account of his race.  He claims that beginning in September 2007, Bevan

12  "initiated a pattern of violence in the workplace abuse" against him, which was allowed and

13  ratified by Thomas and the City.  Harris asserts that the actions of Thomas and the City

14  also included a continuing refusal to accept his complaints about Bevan, and that he was

15  subjected to a "reign of terror" in connection with his attempts to retain his employment.

16       The court finds that the motion must be GRANTED, because Harris has failed to

17  meet his burden of showing that he was subjected to unwelcome conduct based on his

18  race or color that was so severe or pervasive as to alter the terms and conditions of

19  employment.  With regard to Harris' claim that "the record" shows that he was subjected to

20  harassment on account of his race, he has cited to no specific fact in the record to make

21  this showing.  Moreover, Harris has conceded that neither Thomas nor Bevan ever uttered

22  any racial slur or made any comments about his race, and none of the witnesses who

23  testified could point to any such comments by Thomas or Bevan.

24       4.    Section 1981 claim

25       Defendants argue that the § 1981 claim must be dismissed because § 1981 applies

26  to discrimination with respect to contracts, and Harris was a public employee whose

27  employment was governed by statute, not contract.  In addition, defendants assert that the

28  City cannot be held vicariously liable under § 1981 for any alleged discriminatory or

17

United States District Court

For the Northern District of California

1    retaliatory conduct by Thomas or Bevan because Thomas and Bevan are not final

2    policymakers with respect to the employment decisions at issue.

3         The court declines to rule on the first ground argued by the City, as the law appears

4    unsettled on the question whether a California public-entity employee may assert a § 1981

5    claim against his/her employer.  It is clearly established under California law that a public

6    employee cannot bring a claim for breach of contract or breach of implied contract against

7    the public entity that employs him.  See Miller v. State of California, 18 Cal. 3d 808, 813

8    (1977); Hill v. City of Long Beach, 33 Cal. App. 4th 1684, 1690 (1995).  It is not so clearly

9    established, however, that a California public employee cannot bring a § 1981 claim

10   against the public entity that employs him.

11        For example, in Zimmerman v. City and County of San Francisco, 2000 WL

12   1071830 (N.D. Cal., July 27, 2000), the court held that because a § 1981 claim must be

13   based on a contractual relationship, and because the terms and conditions of public

14   employment in California are determined by law, not by contract, the plaintiff (a civil service

15   employee) could not establish a claim under § 1981.  Id., 2000 WL 1071830 at *10.

16        In Barefield v. California State University, Bakersfield, 2006 WL 829122 (E.D. Cal.,

17   March 28, 2006), the court cited Zimmerman, concluding that because California law finds

18   state employment to be statutory, not contractual, the plaintiff could not maintain a claim

19   under § 1981.[2]  The Barefield court relied primarily on a 1989 decision, Judie v. Hamilton,

20   872 F.2d 919 (9th Cir. 1989), in which the Ninth Circuit applied a three-part test derived

21   from Burnett v. Grattan, 468 U.S. 42 (1981), to hold that a public employee in the State of

22   Washington had "no cognizable claim for violation of the right to contract under

23   § 1981."  Judie, 872 F.2d at 923 (citing Burnett, 468 U.S. at 47[3]).

24

25        [2]  The court notes that in Pittman v. Oregon, Employment Dep't., 509 F.3d 1065, 1069
26   (9th Cir. 2007), the Ninth Circuit ruled that states are immune from § 1981 claims under the
     Eleventh Amendment.

27        [3]  Under the Burnett test, if no suitable federal rule exists, courts should consider the
28   application of state common law, as modified and changed by the constitution and statutes of
     the forum state, but only to the extent that state law is not inconsistent with the Constitution
     and laws of the United States.  Id.

United States District Court

For the Northern District of California

1   More recently, however, district courts in this Circuit have held that public employees

2   should not be foreclosed from proceeding with § 1981 claims.  See, e.g., Byrd v. California

3   Sup. Court, County of Marin, 2009 WL 2031761, at *6-7 (N.D. Cal., July 8, 2009); Peterson

4   v. State of Calif. Dep't of Corrections and Rehabilitation, 451 F.Supp. 2d 1092, 1101-04

5   (E.D. Cal. 2006); Lukovsky v. City and County of San Francisco, 2006 WL 436142, at *2-4

6   (N.D. Cal., Feb. 21, 2006).

7   In all three of these decisions, the courts applied the analysis from Judie, but also

8   cited a 2003 decision, White v. Davis, 30 Cal. 4th 528 (2003), in which the California

9   Supreme Court reviewed a series of California cases that had imposed contractual duties

10  on public employers, including the right of an employee to remain in an office, the right to

11  continuation of civil service status, the right to payment of a salary that has been earned,

12  and the right to retain an accrued pension.  See, e.g., Lukovsky, 2006 WL 436142 at *3

13  (citing White, 30 Cal. 4th at 656-66).[4]

14  These courts also concluded that because there is a clear federal policy expressed

15  in the civil rights statutes to prevent employment discrimination by governmental entities,

16  the third part of the Burnett test, as adopted by Judie, requires that public employees be

17  permitted to pursue § 1981 claims against their employers.

18  Judie was decided prior to the 1991 amendment of § 1981, and the Ninth Circuit has

19  provided no guidance since that time in any reported decision.  In light of the absence of

20  recent direction, and the fact that different courts have taken opposite approaches, the

21  court is reluctant to grant defendants' motion as to the first ground, particularly since the

22  second ground argued by defendants is meritorious.

23  The court finds, however, that the motion must be GRANTED as to the second

24  ground argued by defendants.  As with claims under 42 U.S.C. § 1983, a municipality may

25  _____

26      [4]  The Lukovsky court also appears to have borrowed the reasoning adopted by the

27  Ninth Circuit in a 2002 unreported decision, Ramirez v. Kroonen, 44 Fed. Appx. 212, 2002 WL
    1837932 (9th Cir., Aug. 12, 2002), where the court held that the fact that the plaintiff was a

28  public employee did not bar him from proceeding with a § 1981 claim of failure to promote.

United States District Court

For the Northern District of California

1  be held liable for § 1981 claims only if the plaintiff alleges and proves that his injury resulted

2  from a municipal policy, practice, or custom.  Federation of African Am. Contrs. v. City of

3  Oakland, 96 F.3d 1204, 1214-15 (1996) (1991 amendment to § 1981 preserves "policy or

4  custom" requirement in suits against state actors).  There is no respondeat superior liability

5  for § 1981 claims.  Id.  Under the rule articulated in Monell v. Dept. of Social Services, 436

6  U.S. 658 (1978), municipalities are answerable only for their own decisions, and cannot be

7  held vicariously liable for the constitutional torts of their agents.  See id. at 691.

8        A plaintiff satisfies the principles of Monell liability by demonstrating that an "official

9  municipal policy" of some sort caused the constitutional tort in question.  A plaintiff can

10  demonstrate this in one of three ways:  by showing that the alleged violation in question

11  was committed by the employee pursuant to a longstanding practice or custom; by showing

12  that the employee causing the violation in question has "final policymaking authority;" or by

13  showing that the employee causing the violation had his or her actions "ratified" by the "final

14  policymaker."  See, e.g., Christie v. Iopa, 176 F.3d 1231, 1235-40 (9th Cir. 1999).

15        Here, in his opposition to the City's motion, Harris has not cited a single piece of

16  evidence that supports the existence of any City custom or policy, that establishes that

17  Thomas or Bevan had final policymaking authority, or that shows that their actions were

18  ratified by any person or body with final policymaking authority.

19        As to the first point, Harris has submitted no evidence establishing the existence of

20  any official municipal policy.  In discovery, when the City requested that Harris identify the

21  policy, practice, or custom that caused his injuries, he did not identify any specific policy of

22  the City, the CSC, or the Department of Public Health.  Instead, he repeated his allegation

23  that he had been placed on unpaid administrative leave, and then terminated, which he

24  asserts constituted a pattern of discrimination and harassment.

25        As to the second point, Harris argues that Thomas and Nursing Director Mivic Hirose

26  were the final policymakers, who made the decisions re suspension and termination.  The

27  fact that a city employee has independent decision-making power does not render him a

28  final policymaker for purposes of municipal liability.  "If the mere exercise of discretion by

20

United States District Court

For the Northern District of California

1    an employee could give rise to a constitutional violation, the result would be

2    indistinguishable from respondeat superior liability."  City of St. Louis v. Praprotnik, 485

3    U.S. 112, 126 (1988); see also Pembaur v. City of Cincinnati, 475 U.S. 469, 484 & n.12

4    (1986).

5         The identification of policymaking officials is a question of state law.  Christie, 176

6    F.3d at 1235.  Under California law, a city's Charter determines municipal affairs such as

7    personnel matters.  Hyland v. Wonder, 117 F.3d 405, 414 (9th Cir. 1997).  The Charter of

8    the City and County of San Francisco makes clear that the Civil Service Commission

9    ("CSC")  is the final policymaker with respect to employment matters.  Section 10.100

10   states that the CSC "is charged with the duty of providing qualified persons for appointment

11   to the service of the City and County."

12        Further, § 10.101 makes it the responsibility of the CSC to adopt "rules, policies and

13   procedures" to govern an exhaustive list of topics relating to city employment.  The CSC

14   has exercised this grant of power by adopting numerous rules on an exhaustive list of

15   employment issues including but not limited to appointment to civil service positions, equal

16   opportunity and employer-employee relations, layoff, and separation.  See, e.g., Civil

17   Service Commission Rules 103, 110, 114, 121, 122.13

18        As to the third point, Harris argues that Thomas, as the employee making the final

19   decision regarding the suspension and termination, had his actions ratified by the final

20   policymaker (which he now seems to agree was the CSC), because the CSC ratified the

21   restrictions placed on Harris' future employment with the City.  Nevertheless, as defendants

22   assert, Harris has provided no evidence that the CSC actually ratified Harris' decision.  The

23   document that plaintiff cites in support of his argument, Exhibit G to the Thomas

24   Declaration, does not reflect any such ratification, but rather simply advises plaintiff that he

25   has 20 days to request a hearing for review of his employment restrictions by the CSC,

26   adding, "If you do not request a hearing or file an appeal, the Human Resources Director

27   will take final administrative action and the restriction(s) recommended, if any, will be in

28   effect."

United States District Court

For the Northern District of California

1    Harris cannot show that the CSC delegated final policymaking authority to Thomas,

2  and he concedes he cannot show that it was delegated to Bevan.  The Commission

3  explicitly retains the final word with respect to employment matters. The Charter gives the

4  CSC jurisdiction over virtually every conceivable personnel action. See Charter §10.101.

5  As the final policymaker for personnel matters, the CSC is free to delegate broad

6  operational authority to a municipal department – including authority over personnel policy

7  – without turning that department into a "final policymaker" for purposes of municipal

8  liability.  Praprotnik, 485 U.S. at 127-28; Pembaur, 475 U.S. at 484 & n.12.

9    Thus, even had Harris provided some evidence that the Department of Public Health

10  or Thomas had a "policy" with respect to the practices identified in his discovery responses,

11  that evidence would be insufficient as a matter of law to support a finding of municipal

12  liability in the absence, as here, of evidence of a delegation of authority.

13  C.    Objections to Evidence

14    Both Harris and defendants have filed extensive objections to the evidence

15  submitted by the other side.  Harris objects to most of the statements in the declarations of

16  Dr. Austin, Ms. Lunsford, Mr. Ramirez, and defendant Thomas on the ground that much of

17  what they report concerning the September 2007 and March 2008 incidents, and the

18  events that followed, is based on statements of other persons, and is therefore inadmissible

19  hearsay.  Harris also objects to many of the statements on the grounds that they are not

20  based on personal knowledge or that they lack relevance.

21    Defendants object to many, if not all, of the statements in the declarations of Harris,

22  Joycelyn Harris, Ms. Mace, Mr. Glover, Charlene Oler, Dr. Zacher, and Ms. Rutherford, on

23  numerous grounds, including hearsay, relevance, improper opinion testimony, lack of

24  personal knowledge, and lack of foundation,

25    The court has not relied on any of the disputed evidence to grant or to deny

26  summary judgment.  The court has denied summary judgment as to the discrimination and

27  retaliation claims because triable issues exist regarding the reason or motivation behind the

28  differences in the treatment of Harris and Bevan.  The court has granted summary

judgment as to the harassment and § 1981 claims because Harris has failed to meet his burden under either claim, as explained above.  To the extent that the court may have considered some of the disputed evidence in finding that triable issues exist regarding the discrimination and retaliation claims, the objections are OVERRULED.

## CONCLUSION

In accordance with the foregoing, the court DENIES the motion as to the claims of discrimination and retaliation under Title VII and FEHA, and GRANTS the motion as to the claim of discrimination and retaliation under 42 U.S.C. § 1981 and the claim of harassment under FEHA.  The parties are referred by separate order for a mandatory settlement conference.

**IT IS SO ORDERED.**

Dated: August 6, 2009

_____
PHYLLIS J. HAMILTON
United States District Judge